IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 21, 2017 Session

IN RE LIAM S., ET AL.[1]

**Appeal from the Juvenile Court for Jefferson County**
**No. 16-00423     Dennis Roach, II, Judge**

_____

No. E2016-02461-COA-R3-PT

_____

This appeal involves the termination of a mother and father's parental rights to their two minor children. Following a bench trial, the trial court found that clear and convincing evidence existed to support the termination of each parent's parental rights on the statutory grounds of abandonment for failure to provide a suitable home, substantial noncompliance with the requirements of the permanency plan, and the persistence of conditions which led to removal. Relative to Mother, the court found clear and convincing evidence existed to support the additional grounds of abandonment for failure to visit and to pay child support. The court further found that termination of each parent's rights was in the best interest of the children. The parents appeal. We affirm the trial court's judgment as to grounds for termination but vacate the trial court's judgment as to the best interest of the children and the trial court's judgment terminating the mother and the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part and Vacated in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., J. and D. MICHAEL SWINEY, C.J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Katie L.

Daniel Hellman, Knoxville, Tennessee, for the appellant, Erin S.

_____

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

## I.  BACKGROUND

Liam S. was born to Katie L. ("Mother") and Erin S. ("Father") (collectively "the Parents") in 2009.  Mother and Father never married.  Jonah L. was born in 2012.  Father was not listed on Jonah's birth certificate; however, Mother identified him as the father, and he also held himself out as the father.

The Parents first became involved with the Tennessee Department of Children's Services ("DCS") in January 2014, at which time the Parents entered into a non-custodial permanency plan to address issues of drug abuse, mental health, domestic violence, inadequate parenting skills, and unstable housing.  The following month, on February 20, 2014, DCS received another referral based upon the same allegations.  On that day, the Parents were also arrested for traffic offenses and possession of drug paraphernalia.  Mother tested positive for oxycodone, opiates, marijuana, and suboxone, while Father tested positive for oxycodone, opiates, and marijuana.  Liam and Jonah ("the Children") were later adjudicated as dependent and neglected.  Mother was sentenced in October 2014 to 6 years for aggravated burglary, 2 years each for 2 counts of theft, and 11 months and 29 days for possession of drug paraphernalia.  Her concurrent sentences were suspended to supervised probation following the service of 120 days in jail.  She was also required to complete a drug and alcohol assessment and comply with recommendations and to submit to random drug screens.

Several permanency plans were entered, each of which contained the following requirements for each parent:  (1) submit to drug screens and pill counts; (2) complete mental health and alcohol and drug assessments and follow recommendations; (3) complete parenting, anger-management, and domestic violence classes and follow recommendations; (4) maintain safe and stable housing; (5) obtain a legal source of income and transportation; and (6) pay child support.  The Parents participated in the development of the initial plan that remained unchanged with the exception of the added goal of adoption in August 2015.[2]  DCS later withdrew the requirements that Mother participate in anger-management and domestic violence classes.

---

[2] The Parents argue on appeal that they were not informed or invited to participate in the development of two plans, dated August 14, 2015, and February 22, 2016, that added the goal of adoption; however, the record also reflects that the Parents participated in the ratification hearing for the said plans and indicated assent to the goals and terms contained therein.

DCS paid for services from June 2014 through July 2015. While the Parents completed some requirements, DCS could no longer provide funding because the Parents failed to follow recommendations from their assessments and to demonstrate a lasting change. Specifically, Mother completed her alcohol and drug assessment in June 2014 but failed to follow the recommendations by attending intensive education. She later relapsed and resumed illegal drug use. She also refused drug screens in Spring 2015 and failed to submit to hair follicle testing as requested until June 2016. Relative to Father, he tested positive for marijuana in July 2015 and failed to submit to a hair follicle test as requested until July 2016. He also failed to complete the parenting component of his alcohol and drug assessment and to attend an education program.

Mother attended multiple drug treatment programs but failed to successfully combat her addiction until she enrolled in Life Changers, a 12-month faith-based discipleship program, in September 2015. It is not a licensed drug treatment facility. However, Mother lived on campus and was required to submit to random drug screens. DCS transported the Children to the Life Changer's facility for visitation. Mother was unable to attend two of the scheduled four visitations during the time period due to her placement on disciplinary probation. Mother also only made one child support payment of $62.82 on June 11, 2015. She was not permitted to work outside the facility while enrolled in the program.

DCS filed a petition to terminate each parent's parental rights on May 20, 2016, based upon the statutory grounds of abandonment for failure to provide a suitable home, substantial noncompliance with the permanency plan, and the persistence of conditions which led to removal. Relative to Mother, DCS alleged the additional grounds of abandonment for failure to visit and to pay child support.

The case proceeded to a hearing in October 2016. Much of the testimony presented related to Mother's repeated attempts to overcome her addiction. Mother conceded that DCS had provided her with a list of housing resources in the four months following the removal of the Children. She explained that she did not pursue suitable housing because of her ongoing addiction at the time. She provided that during the relevant time period, she lived with different people who also abused drugs.

Mother testified that she attended multiple drug treatment programs and relapsed following completion of those programs. However, Mother testified that her participation in the Life Changer's program helped her to finally defeat her "active addiction." She noted that she had not failed a drug screen while attending the program. She conceded that she would be unable to care for the Children until she graduated and then completed an additional 90-day aftercare program. She further conceded that she

had been demoted as a result of the stress of these proceedings, thereby delaying her graduation. She claimed that despite the delay, she was set to graduate in a few weeks following the hearing. She agreed that she had not remitted payment for child support during the relevant time period even though she was capable of obtaining employment. She noted that she was not permitted to obtain employment outside of the program.

Jessica Deskins, a director of Life Changers, and Ken Gilliam, pastor and attorney for Life Changers, spoke highly of Mother and attested to her progress since her entry into the program. They conceded that she had received "disciplinary write-ups" but explained that she had improved and shown significant progress. Ms. Deskins further provided that Mother would be eligible for transitional housing upon completion of the after-care program. Mr. Gilliam provided that Mother currently worked in a Life Changer's retail store he managed. He claimed that she was an exemplary employee.

Relative to the Children, the record established that they responded well to their current foster home, which provided a calm, structured, and supportive environment. Foster Mother testified that the Children have resided with her and her husband since March 2015. She expressed love for the Children and indicated a desire to adopt them. She provided that they called her and her husband mom and dad but also admitted that they referred to the Parents as mom and dad. She stated that the Children never asked for the Parents but acknowledged that they talked about their activities upon returning from visitation and appeared as if they enjoyed the visitation. She provided that they were sometimes "hard to calm down" and "get to sleep" on visitation days. She claimed that Liam also had nightmares on a few occasions following visitation.

Father admitted his drug abuse and his inability to provide suitable housing for the Children at the time of removal. He agreed that DCS *may* have provided him with a list of resources to assist him in obtaining suitable housing but asserted that he found housing without help from DCS. He provided that he had appropriate housing and that he lived with a roommate. He asserted that the roommate was leaving his residence at the time of the hearing and further claimed that he never planned to house the roommate with the Children upon their return. He stated that he maintained stable employment with an income of $1,200 per month and that he was planning to fix his vehicle but had access to other transportation when necessary.

Father claimed that he completed a number of the permanency plan requirements. He alleged that DCS failed to assist him in his completion of the remainder of the permanency plan requirements and that services were later abruptly stopped. He agreed that he had not completed an alcohol and drug education program as a required recommendation from his assessment and that he failed to complete additional parenting education. He claimed that he was unable to afford the classes and education required

and that DCS refused his request for financial assistance. He conceded that at one time, he advised DCS that he would pay for services himself.

Donna Mitchell, who was employed by Covenant Counseling, testified that she provided counseling services for Father in his home in June and July 2015. She recalled reviewing his mental health and alcohol and drug assessments with him. She provided that she recommended intensive outpatient treatment following a failed drug screen in July 2015. She asserted that he minimized his drug abuse and did not indicate intent to remain clean and sober once the Children were returned. She stated that services were discontinued after he failed the drug screen.

Glenda Walthers, a DCS employee assigned to the case, testified that DCS only approved services for those actively completing the requirements of his or her permanency plans. She stated,

> There is a whole chain of persons that have to approve the spending of that money. I have to take it to the team leader. I have to take it to the team coordinator. And then after a certain amount of time when services have been lingering and no completion has been done by the parents, no demonstration that we're close to getting – you know, all of that has to be justified; all of that has to be looked at.

Ms. Walthers admitted that Mother completed her assessments and provided certificates of completion for anger management and domestic violence classes but that Mother never showed a "significant demonstration of a change that was brought on by completion" of her classes. She explained that the Parents remained involved, despite the volatile nature of their relationship while Mother completed the anger management and domestic violence components of the permanency plan. She agreed that Mother completed an alcohol and drug assessment and attended a co-occurring psycho-educational program with Helen Ross-McNabb but provided that Mother later relapsed, necessitating a new assessment and completion of an alcohol and drug treatment program. She stated that Mother never completed a new assessment or attended a licensed drug treatment program. She further claimed that Mother did not have reliable transportation or housing at the time of the hearing.

Ms. Walthers acknowledged that Mother's failure to complete a new assessment and to obtain transportation or housing was likely a result of her enrollment in the Life Changer's program. She agreed that Mother found success in the program and had remained drug free for approximately one year. She further acknowledged that she no longer had reason to believe that the Parents maintained an unhealthy relationship. However, she expressed concern about Mother's ability to remain stable outside of the

structured environment provided by Life Changers. She explained that an actual alcohol and drug treatment program would provide her with the skills necessary to excel outside of a structured environment. She acknowledged that Mother made plans to remain involved with Life Changers for ongoing support and that Mother even expected an offer of employment at the time of her completion of the program.

Relative to each parent's failure to provide a suitable home, Ms. Walthers testified that Father had a roommate who had not passed a background check at the time of the hearing. Additionally, Father could not provide the roommate's last name. She noted that the Children were removed, in part, because the Parents exposed them to inappropriate people and even lived with roommates that also used drugs. She provided that Mother would be unable to provide a suitable home for at least another 90 days following her completion of the program.

Relative to visitation, Ms. Walthers provided that Mother was afforded one four-hour visit per month and that DCS transported the Children to Life Changers for visitation once Mother enrolled in the program. She asserted that Mother only visited twice during the relevant time period, once in February and again in April 2016. She explained that Life Changers denied visitation on two occasions because Mother had been placed on probationary status at Life Changers. She agreed that Mother faithfully attended visitation when not on probationary status even before her entry into the Life Changer's program. She further agreed that Mother's visits with the Children were appropriate with only a few minor issues since the time of removal.

Relative to child support, Ms. Walthers provided that Mother did not remit payment during the relevant time period. She conceded that Mother was not permitted to work while enrolled in the Life Changer's program but asserted that Mother chose to enroll in the program and remain there, despite the fact that her visitation and ability to remit child support were affected by her enrollment.

Relative to the Children, Ms. Walthers claimed that the Children had significant behavioral issues at the time of removal. She asserted that the Children required structure and routine, especially Liam who had been diagnosed with attention deficit hyperactivity disorder. She expressed concern about Mother's ability to raise them and provide the structure and consistency necessary for them to thrive. She claimed that a disruption in their current environment could negatively affect their progress.

Following the hearing, the trial court found clear and convincing evidence to support termination of Mother's parental rights based upon abandonment for failure to remit child support, to visit, and to provide a suitable home; substantial noncompliance with the permanency plan; and the persistence of conditions which led to removal. The

court also found clear and convincing evidence to support termination of Father's parental rights based upon abandonment for failure to provide a suitable home; substantial noncompliance with the permanency plan; and the persistence of conditions which led to removal. The court further found that termination of each parent's parental rights was in the best interest of the Children. This appeal followed.

## II.   ISSUES

We consolidate and restate the issues on appeal as follows:

A.     Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon a finding of abandonment for failure to remit child support pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i).

B.     Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon a finding of abandonment for failure to visit pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i).

C.     Whether clear and convincing evidence supports the court's termination of each parent's parental rights based upon a finding of abandonment for failure to provide a suitable home pursuant to Tennessee Code Annotated section 36-6-102(1)(A)(ii).

D.     Whether clear and convincing evidence supports the court's termination of each parent's parental rights based upon a finding of substantial noncompliance with the permanency plan pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

E.     Whether clear and convincing evidence supports the court's termination of each parent's parental rights based upon the persistence of conditions which led to removal pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

F.     Whether clear and convincing evidence supports the court's finding that termination of each parent's parental rights was in the best interest of the Children pursuant to Tennessee Code Annotated section 36-1-113(i).

## III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1)    [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2)    [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App.

Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (internal citations omitted).

## IV. DISCUSSION

### A. & B.

In terminating Mother's parental rights based upon the statutory ground of abandonment for failure to visit and remit support, the court considered the four months preceding May 20, 2016, the filing date of the termination petition. The relevant time period was January 20, 2016, through May 19, 2016.[3] A parent's willful failure to support "means the willful failure, for a period of four (4) consecutive months, to provide

---

[3] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A parent's willful failure to visit "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

This court has consistently held that the term willfulness as it applies to a party's failure to visit or remit support must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64.

1.

Mother argues that her failure to remit child support was not willful. She further claims that DCS failed to present sufficient evidence to establish her capacity to remit support during the relevant time period.

We acknowledge Mother's enrollment in the Life Changer's program affected her ability to remit support. We also commend Mother in her effort to achieve rehabilitation; however, Mother chose to enroll in the program, knowing that her ability to remit support would be affected. Additionally, this was not a case where a parent had extenuating circumstances but faithfully provided support when he or she was able. *See In re Dylan H.*, No. E2010-01953-COA-R3-PT, 2011 WL 6310465, at *7 (Tenn. Ct. App. Dec. 16, 2011) (reversing the termination decision because mother was simply unable to fulfill her child support obligation during the relevant time period). In this case, Mother remitted one payment of child support throughout the entirety of the Children's placement even when she was actually employed at various times. With these considerations in mind, we conclude that there was clear and convincing evidence to establish that Mother abandoned the Children by willfully failing to remit child during the relevant time period.

2.

Only one statutory ground must be established by clear and convincing evidence to justify termination. Tenn. Code Ann. § 36-1-113(c). In the event of further appellate review, we will address the remaining grounds. Mother claims that her failure to visit was not willful as evidenced by her placement on probationary status, which affected her ability to attend visitation. Further, she notes that she attended two of the four visits during the relevant time period. The Supreme Court has held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *In re A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2006) (citing *Swanson*, 2 S.W.3d at 189). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (citation omitted). Again, Mother chose to enroll in Life Changers, knowing that her ability to visit with the Children could be affected. We acknowledge that Mother faithfully attended visitation when able; however, two, four-hour visits in the relevant time period cannot be characterized as more than token visitation. With these considerations in mind, we conclude that there was clear and convincing evidence to establish that Mother abandoned the Children by willfully failing to visit during the relevant time period.

C.

A parent may be found to have abandoned his or her child by failing to establish a suitable home. The relevant statutory provision provides, in pertinent part, as follows:

> The child has been removed from the home of the [parent] as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child [ ], and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the [parent] to establish a suitable home for the child, but that the [parent] have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The

efforts of the department or agency to assist a [parent] in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the [parent] toward the same goal, when the [parent] is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). Termination for failure to provide a suitable home requires a finding, supported by clear and convincing evidence that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home.[4] Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS is required to use its "superior insight and training to assist parents . . . whether the parents ask for assistance or not." *State, Dep't of Childrens Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008).

*Mother*

Mother claims that the record is silent as to DCS's reasonable efforts. We disagree. Mother admitted that DCS provided her with a list of housing resources but that she was unwilling to accept assistance at that time due to her addiction. Accordingly, we conclude that DCS's efforts were reasonable in light of Mother's failure to accept assistance and that Mother abandoned the Children by failing to establish a suitable home at the time of the hearing.

*Father*

Father claims that he established suitable housing and that his roommate was willing to leave the residence once Liam returned home. We disagree. The Children were removed, in part, due to the Parents' inability to provide a suitable home without the assistance of questionable roommates. Father was less than forthcoming with details concerning his roommate and failed to present a suitable home for inspection prior to the hearing. Accordingly, we conclude that Father abandoned the Children by failing to provide a suitable home.

D.

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related

---

[4] Our Supreme Court specifically overruled the progeny of cases requiring "DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights." *In re Kaliyah S.*, 455 S.W.3d 533, 555, n. 34 (Tenn. 2015). However, that holding does not abrogate DCS's responsibility to make reasonable efforts to assist parents in establishing a suitable home pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(ii).

to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *Id.* at *12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

Here, the permanency plans required each parent to (1) submit to drug screens and pill counts; (2) complete mental health and alcohol and drug assessments and follow recommendations; (3) complete parenting, anger-management, and domestic violence classes and follow recommendations; (4) maintain safe and stable housing; (5) obtain a legal source of income and transportation; and (6) pay child support.

*Mother*

Mother claims that she evidenced substantial compliance by her completion of the assessments and classes, attendance at Life Changers, and recent negative drug screens. While we acknowledge that Mother found success at Life Changers, the record reflects that the permanency plan required completion of an additional alcohol and drug assessment and attendance at an alcohol and drug treatment program for good reason, namely to ensure that Mother was able to combat her addiction outside of the confines of an extremely structured housing facility. Additionally, Mother had not maintained safe and stable housing or paid support at the time of the hearing. These requirements were not only reasonable and related to remedying the conditions that warranted removal, namely drug abuse, an inability to parent, and unsuitable housing, but completion of these requirements were essential for establishing that Mother could care for the Children without assistance. With these considerations in mind, we conclude that there was clear

and convincing evidence to establish that Mother failed to substantially comply with the requirements of the permanency plan.

*Father*

Father claims that he completed the majority of the permanency plan requirements. The record reflects that Father had not completed an alcohol and drug education program as a required recommendation from his assessment and that he failed to complete additional parenting education. Additionally, he had not yet maintained safe and stable housing without the assistance of a questionable roommate at the time of the hearing. These requirements were not only reasonable and related to remedying the conditions that warranted removal, namely drug abuse, an inability to parent, and unsuitable housing, but completion of these requirements were essential for establishing that Father could care for the Children without assistance. Accordingly, we conclude that there was clear and convincing evidence to establish that Father failed to substantially comply with the requirements of the permanency plan.

E.

Under Tennessee law, a court may terminate parental rights when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal *or other conditions* that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine,* 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the

prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.,* 182 S.W.3d at 874.

*Mother*

Mother claims that the conditions which led to removal have since been remedied as evidenced by her substantial progress. We disagree. Mother had not maintained safe and stable housing or established her ability to combat her addiction outside of the confines of an extremely structured housing facility. The record reflects that Mother still had to complete an additional 90-day aftercare program upon graduation before she could arrange for housing with the Children. Given Mother's tendency to relapse, we conclude that that there is little likelihood that the conditions which led to removal will be remedied *at an early date* so that the Children can be safely returned in the near future and that the continuation of the relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. Accordingly, we conclude that the conditions which led to removal still persist.

*Father*

Father claims that he remedied the conditions which led to the Children's removal as evidenced by his establishment of suitable housing, completion of various assessments and programs, and his last negative drug screen in July 2016. Again, we note that Father had not completed an alcohol and drug education program, completed additional parenting education, or maintained safe and stable housing without the assistance of a questionable roommate at the time of the hearing. Given Father's inability to accept responsibility for these failures or to give an indication that these issues would be addressed in the near future, we conclude that there is little likelihood that the conditions which led to removal will be remedied *at an early date* so that the Children can be safely returned in the near future and that the continuation of the relationship greatly diminishes the Children's chances of early integration into a safe, stable and permanent home. Accordingly, we conclude that the conditions which led to removal still persist.

F.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground to terminate each parent's parental rights, we must consider whether termination was in the best interest of the Children. In making this determination, we are guided by the following non-exhaustive list of factors:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[5]

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

---

[5] *In re Kaliyah S.*, 455 S.W.3d at 555 ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

### *Mother*

We, like the trial court, believe that is was an extremely close case. Questions remain as to whether Mother may effectively parent the Children in a safe and stable home following her completion of the Life Changer's program. The Children currently reside in a safe and stable foster home with parents who love them and indicated a desire to adopt them. However, we cannot discount the fact that Mother has made tremendous progress through her year-long attendance at Life Changers. We believe that this is simply one of the rare cases where the parent has made a lasting adjustment, while managing to maintain a relationship with her children. We note that Mother faithfully attended visitation before and after the relevant time period and that the Children still referred to her as "mom" at the time of the hearing.

### *Father*

While the record reflects that Father's progress was less significant than Mother's, he has maintained a relationship with the Children since removal and has faithfully attended visitation. He has also consistently paid child support and successfully passed recent drug screens. We also do not wish to leave the Children without a father if the proceedings following remand establish that termination of Mother's parental rights is not in the best interest of the Children.

Accordingly, we reverse the trial court's best interest finding relative to Mother and Father and the termination of each parent's parental rights.

# V.    CONCLUSION

We hold that the evidence does not preponderate against the trial court's judgment finding multiple grounds for the termination of the parental rights of both Mother and Father.  As a matter of law, we hold that the evidence in the record clearly and convincingly supports the trial court's findings with respect to grounds for termination. Accordingly, this part of the trial court's judgment is affirmed.  We further hold, however, that the evidence preponderates against the trial court's best interest of the Children determinations as to both Mother and Father.  Accordingly, we vacate (1) the trial court's judgment as to the best interest of the Children and (2) so much of the trial court's judgment as terminates the parental rights of both Mother and Father.  This case is remanded to the trial court for further proceedings on the sole issue of the best interest of the Children.  Costs on appeal are taxed to the Tennessee Department of Children's Services.


_____
JOHN W. McCLARTY, JUDGE